MANUEL v GILL

Docket No. 258933. Submitted February 14, 2006, at Lansing. Decided
    March 23, 2006, at 9:05 a.m.

Iskandar Manuel and other members of his family brought an action
    in the Ingham Circuit Court against Timothy J. Gill and others,
    including the Tri-County Metro Narcotics Squad (TCM), some of
    the governmental entities comprising the TCM, and several police
    officers who were assigned to the TCM. The complaint alleged (1)
    violations of 42 USC 1983 under a state-created danger theory of
    liability, (2) gross negligence, (3) intentional or grossly negligent
    infliction of emotional distress, and (4) breach of contract, all
    related to an undercover narcotics investigation for which Iskan-
    dar Manuel had agreed to act as an informant. The court, Paula J.
    Manderfield, J., granted the defendants summary disposition on
    all claims and denied the plaintiffs' request to amend their
    pleadings. The plaintiffs appealed.

    The Court of Appeals held:

    The trial court properly granted the defendants summary
    disposition on all of the plaintiffs' claims.

    1. 42 USC 1983 provides no substantive rights by itself, but
    merely supplies a remedy for violations of rights under other laws.
    To establish a claim under 42 USC 1983, a plaintiff must show that
    a constitutional violation occurred. Under the state-created dan-
    ger theory of liability alleged by the plaintiffs, a state may be liable
    under 42 USC 1983 for private acts of violence if (1) there was an
    affirmative act by the state that created or increased the risk that
    the plaintiff would be exposed to an act of violence by a third party,
    (2) there was a special danger to the plaintiff, with the plaintiff
    placed specifically at risk as opposed to the public at large, and (3)
    the state knew or should have known that its actions specifically
    endangered the plaintiff. The plaintiffs alleged that the under-
    cover police officer defendants violated the plaintiffs' rights by
    their conduct and actions. These defendants are entitled to quali-
    fied immunity as long as their conduct does not violate clearly
    established statutory or constitutional rights of which a reason-
    able person would have known. The plaintiffs voluntarily partici-
    pated in the undercover investigation that involved the challenged

conduct. The plaintiffs, as confidential informants, voluntarily assumed the risks inherent in that operation. Undercover operations are inherently dangerous, and the defendants' conduct created no special danger beyond that involved in such an operation. Absent a constitutional violation, the defendants are not liable under this theory.

2. The trial court erred to the extent that it ruled that the plaintiffs' allegations failed to state a breach of contract claim. While the plaintiffs did not produce a written agreement with the TCM, the statute of frauds did not require a writing because nothing indicates that the agreement could not have been performed in one year, MCL 566.132(1)(a). Nor was this agreement a special promise to answer for the debt, default, or misdoings of another person under MCL 566.132(1)(b). That provision applies only to collateral promises for debts already owed. The agreement in this case involved reimbursement for losses resulting from participation in the undercover operation. A promise to pay for goods or services to be rendered in the future is an original, rather than a collateral, promise and is outside the statute of frauds. The trial court correctly determined that the TCM is a legal entity capable of being sued in its own name, as provided by MCL 124.507(2) and the interagency agreement creating the TCM. Because the TCM is operated under the direction and supervision of the Michigan State Police, however, it is equivalent to a state agency. Thus, claims against it must be filed in the Court of Claims, not in the circuit court. The trial court properly granted summary disposition on the breach of contract claim, albeit for the wrong reason.

3. While the plaintiffs alleged gross negligence by four of the police officer defendants, the conduct of three of those defendants was not the proximate cause of the alleged injuries. Rather, the most immediate, direct cause of any injuries was the threatening conduct of the targets of the undercover operation. Therefore, those officers are immune from liability under MCL 691.1407(2). With respect to the fourth officer, his alleged conduct was arguably not within the scope of employment or within the exercise or discharge of a governmental function. The plaintiffs, however, failed to produce admissible evidence in response to the officer's affidavit, so summary disposition was proper with respect to him.

4. The plaintiffs failed to state a valid claim of intentional infliction of emotional distress. The conduct alleged cannot be considered so outrageous and extreme as to surpass all possible bounds of decency, nor can it be regarded as atrocious or utterly

intolerable in a civilized community. For the most part, it appears that the plaintiffs simply disagree with how the undercover investigation was conducted.

5. The trial court did not err by denying the plaintiffs' motion to amend their complaint because any amendment with regard to gross negligence would have been futile. Nor have the plaintiffs shown plain error affecting their substantial right with regard to other unspecified amendments they requested.

Affirmed.

1. CIVIL RIGHTS — VIOLATIONS OF CONSTITUTIONAL RIGHTS — STATE-CREATED DANGERS — UNDERCOVER OPERATIONS.

The state may be liable for private acts of violence if (1) the state's affirmative act either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party, (2) a special danger to the plaintiff existed, that is, the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affected the public at large, and (3) the state knew or should have known that its actions specifically endangered the plaintiff; a plaintiff who is a confidential informant and who voluntarily participates in an undercover investigation voluntarily assumes the risks inherent in participating in such an investigation, however, and may not bring an action alleging a violation of the constitutional right to be free from state-created danger (42 USC 1983).

2. CONTRACTS — STATUTE OF FRAUDS — COLLATERAL PROMISES TO PAY DEBTS ALREADY OWED.

The provision of the statute of frauds requiring a writing for an agreement involving a special promise to answer for the debt, default, or misdoings of another person applies only to collateral promises for debts already owed and does not apply to a promise to pay for goods or services to be rendered in the future, which is an original, rather than a collateral, promise (MCL 566.132[1][b]).

*Kevin L. McAllister* for Iskandar Manuel and others.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, and *James T. Farrell* and *Ann M. Sherman*, Assistant Attorneys General, for Timothy J. Gill, Kenneth Knowlton, and the Tri-County Metro Narcotics Squad.

*Cohl, Stoker, Toskey & McGlinchey, P.C.* (by *John R. McGlinchey* and *Timothy M. Perrone*), for Ingham County, the Ingham County Sheriff, and Evan Bennehoff, Jr.

*Johnson, Rosati, LaBarge, Aseltyne & Field, P.C.* (by *Patrick A. Aseltyne, Jason D. Kolkema,* and *Mark E. Rath*), for Eaton County and the Eaton County Sheriff.

*Cummings, McLorey, Davis & Acho, P.L.C.* (by *Joseph Nimako*), for Clinton County and the Clinton County Sheriff.

*Plunkett & Cooney, P.C.* (by *Mary Massaron Ross* and *David K. Otis*), and *Paul F. Novak,* City Attorney, for the city of Lansing, the Lansing Chief of Police, and the Lansing Police Commission.

Before: METER, P.J., WHITBECK, C.J., and SCHUETTE, J.

PER CURIAM. In this action alleging (1) violations of 42 USC 1983 under a state-created danger theory if liability, (2) gross negligence, (3) intentional or grossly negligent infliction of emotional distress, and (4) breach of contract, plaintiffs Iskandar Manuel, Maggie Manuel, Jimmy Manuel, Joseph Manuel, Imad Manuel, and Adel Manuel (the Manuels) appeal by leave granted the trial court's opinion and order granting summary disposition to defendants, which include various law enforcement agencies and personnel, pursuant to MCR 2.116(C)(8) and (10). This case stems from Iskandar's agreement to act as an informant for defendant Tri-County Metro Narcotics Squad in an undercover narcotics operation. The Manuels' allegations stem from conduct that occurred during that undercover investigation. On appeal, the Manuels argue that the trial court erred by granting summary disposition for defen-

dants on all their claims and by denying their request to amend their pleadings. We conclude that the trial court's grant of summary disposition on all grounds was proper, and we therefore affirm.

### I. BASIC FACTS AND PROCEDURAL HISTORY

The Tri-County Metro Narcotics Squad (TCM) is a task force created to enforce narcotics and controlled substances laws in Michigan. The TCM is composed of various law enforcement agencies, including the sheriff's departments of Ingham, Eaton, and Clinton counties, the Lansing Police Department, the East Lansing Police Department, the Michigan Department of State Police, the Lansing Township Police Department, and the Lansing office of the Federal Bureau of Investigation. The participating police agencies assign officers to the TCM, and, while assigned to the TCM, those officers operate under the direction and supervision of the Michigan State Police (MSP). Accordingly, the officers must conform to certain operating procedures, as established by the MSP criminal investigative division policy book, including procedures for dealing with confidential informants.

The Manuels are Lansing residents who own a family car dealership also located in Lansing. Iskandar and Maggie Manuel are married and reside in the same household as the remaining plaintiffs, who work in the family business.[1]

In 1998, Iskandar became aware that Toby Torres, a customer of the Manuels' car dealership, was a drug dealer whom the TCM was investigating. Defendant Michigan State Police Trooper Kenneth Knowlton, serving as a TCM officer, asked Iskandar to assist the

---

[1] It is unclear whether Jimmy, Joseph, Imad, and Adel are the children of Iskandar and Maggie Manuel.

TCM in building a case against Torres. In 1999, Iskandar agreed to assist with the investigation after the TCM assured him that his identity would not be disclosed and that the TCM would reimburse him for any expenses incurred and any losses that the family business incurred. Thereafter, Iskandar informed the TCM of planned drive-by shootings, drug deals, and other criminal activities of Torres and his acquaintances. The TCM also installed surveillance equipment in the Manuels' residence and family business to videotape and record meetings and phone calls.

On December 5, 2003, the Manuels filed a first amended complaint, alleging violations of their constitutional rights under a state-created danger theory pursuant to § 1983 against Michigan State Police Trooper (and TCM officer) Timothy Gill, Trooper Knowlton, and the TCM (collectively, the state defendants); Clinton County and the Clinton County Sheriff (collectively, the Clinton County defendants); Ingham County, the Ingham County Sheriff, and Ingham County Sheriff's Department Officer (and TCM officer) Rusty Banehoff[2] (collectively, the Ingham County defendants); Eaton County and the Eaton County Sheriff (collectively, the Eaton County defendants); the city of Lansing, the Lansing Chief of Police, and the Lansing Police Commission (collectively, the Lansing defendants); and retired Michigan State Police Captain Jimmy Patrick.[3] The Manuels also alleged gross negli-

---

[2] This name is an alias. Rusty Banehoff's actual name is Evan Bennehoff, Jr.

[3] Jimmy Patrick is a retired Michigan State Police captain who oversaw the operation of the Tri-County Metro Narcotics Squad during the time relevant to this case. Although the Manuels' amended complaint named Jimmy Patrick as a defendant, it does not appear that Patrick participated in this case in the trial court, and he has not participated in this Court.

gence against Banehoff, Gill, Knowlton, and Patrick; intentional or grossly negligent infliction of emotional distress against Banehoff, Gill, and Knowlton; and breach of an expressed or implied contract against the TCM.

The Manuels alleged that Gill, Knowlton, and the TCM continued to authorize the placement of tracking devices on vehicles that they sold to drug dealers despite the fact that it would be readily discoverable that the devices were installed while the vehicles were in Iskandar's possession. The Manuels also alleged that Gill prompted Iskandar to sign a form consenting to a search of a residence in which Iskandar had allowed one of the targets of the investigation to reside and that the form constituted discoverable evidence indicating Iskandar's involvement in disregard of the promise to keep his identity secret. The Manuels further alleged that in the fall of 2000, Knowlton informed Torres's probation officer that Iskandar was cooperating with the TCM and that the probation officer thereafter informed Torres of Iskandar's cooperation.

In addition, the Manuels alleged that Gill, Knowlton, and the TCM arranged a drug deal in which the drug traffickers were to deliver 500 pounds of marijuana and 50 kilograms of cocaine. The traffickers delivered the marijuana, but not the cocaine, and Gill, Knowlton, and the TCM refused to pay $300,000 for the marijuana until the cocaine was delivered. The Manuels maintained that Iskandar received repeated threats on his life because the traffickers were never paid for the marijuana. Further, the Manuels alleged that Iskandar gave Knowlton the phone number of a drug dealer's girlfriend and that Knowlton called the phone number and identified himself. According to the Manuels, the dealer was, therefore,

able to determine that Iskandar was working with the police because that phone number had been given only to him.

In addition, regarding another undercover transaction between Iskandar and the drug dealers, the Manuels alleged that Gill called officers who were arresting a dealer over a two-way radio and stated, in a voice loud enough for the drug dealer to hear, that Iskandar had been arrested. Gill did not inform Iskandar of this subterfuge, however, and Iskandar's cooperation with the TCM was apparent when the dealer's son saw Iskandar arrive at the family business moments after his purported arrest. Further, the Manuels alleged that, in 2002, Banehoff was permitted to remain part of an investigation in which "Edward," a friend of Banehoff, was an acquaintance of one of the targets. The Manuels alleged that Banehoff disclosed to "Edward" Iskandar's assistance in the investigation. The Manuels alleged that, as a result of the conduct of Gill, Knowlton, Banehoff, and the TCM in disclosing Iskandar's cooperation, the Manuels' safety was seriously jeopardized. Their purported peril was evidenced, they alleged, by the fact that the windows of Iskandar's son's car were shot out while the car was being driven, a bloody heart with a knife through it was found on the Manuels' doorstep, Iskandar's sons were threatened with retaliation, Iskandar received numerous threatening phone calls, and there was an apparent contract for Iskandar's murder.

Subsequently, each of the defendants moved for summary disposition, and, following hearings on those motions, the trial court issued a written opinion and order granting all defendants' motions for summary disposition. The trial court grouped the Manuels' claims into four categories: (1) the Manuels' § 1983 rights to be free from state-created danger, (2) gross negligence, (3)

intentional infliction of emotional distress, and (4) breach of contract. Regarding the Manuels' § 1983 claim, the trial court determined that, unlike the circumstances of *Kallstrom v City of Columbus*,[4] no affirmative conduct on behalf of the officers amounted to a constitutional violation. The trial court reasoned that the Manuels voluntarily agreed to cooperate with the TCM and that nothing indicated that they could not have withdrawn their cooperation if they became uncomfortable with the investigation. The trial court stated that an investigation of such magnitude is "inherently dangerous" and that defendants' actions "amount to nothing more than conduct implicit in an undercover investigation." The trial court opined that if it were to expand *Kallstrom's* holding to include situations such as this case, it would be virtually impossible for the police to use the voluntary assistance of private citizens in such investigations.

The trial court further determined that the only two allegations that could be considered questionable given *Kallstrom's* holding were the allegations that Knowlton revealed Iskandar's cooperation to Torres's probation officer and that Banehoff allegedly disclosed Iskandar's assistance to "Edward." Regarding the probation officer, the trial court determined that the Manuels failed to rebut the probation officer's affidavit denying knowledge of Iskandar's involvement and produced only hearsay statements made to Iskandar by Torres in response. The trial court stated that it could not "consider such an unreliable statement." Regarding Banehoff's conduct, the trial court, relying on Banehoff's affidavit, determined that he took affirmative steps to ensure that the details of the investigation and the identities of the confidential informants were not re-

---

[4] *Kallstrom v City of Columbus*, 136 F3d 1055 (CA 6, 1998).

vealed. Thus, the trial court ruled that the Manuels failed to state a cause of action under § 1983 because they failed to "allege a recognized constitutional right that has been infringed upon." The trial court further determined that because none of the alleged conduct by the individuals amounted to a violation of a clearly established constitutional right, defendants were entitled to qualified immunity. The trial court thus granted summary disposition under MCR 2.116(C)(8) on the Manuels' § 1983 claims.

Regarding the Manuels' gross negligence allegations, the trial court determined that the Manuels' complaint failed to state a valid claim of gross negligence because none of the alleged conduct amounted to activity "so reckless as to demonstrate a substantial lack of concern for whether an injury results," MCL 691.1407. The trial court thus granted summary disposition for defendants pursuant to MCR 2.116(C)(8) on the Manuels' gross negligence claims. The trial court likewise granted summary disposition for defendants under the same subrule on the Manuels' claims of intentional infliction of emotional distress, reasoning that the Manuels failed to allege conduct so extreme and outrageous as to satisfy the standard for such claims.

Finally, regarding the Manuels' breach of contract claim, the trial court determined that the TCM is a juridical entity subject to suit, but the Manuels pleaded their claim "in the most conclusory" terms and no writing existed establishing the alleged agreement. Thus, the trial court determined that the statute of frauds barred any oral agreement. The trial court granted summary disposition for the TCM on the Manuels' breach of contract claim under MCR 2.116(C)(8).

## II. SUMMARY DISPOSITION

### A. STANDARD OF REVIEW

We review de novo a trial court's decision on a motion for summary disposition.[5] The trial court granted summary disposition for defendants under MCR 2.116(C)(8), but with respect to some defendants, the trial court considered documentary evidence outside the pleadings. Where, as here, it is clear that the trial court looked beyond the pleadings, we "will treat the motions as having been granted pursuant to MCR 2.116(C)(10)," which "tests whether there is factual support for a claim."[6] A motion for summary disposition under MCR 2.116(C)(10) is properly granted if no factual dispute exists, thus entitling the moving party to judgment as a matter of law.[7] In deciding a motion brought under subrule C(10), a court considers all the evidence, affidavits, pleadings, and admissions in the light most favorable to the nonmoving party.[8] The nonmoving party must present more than mere allegations to establish a genuine issue of material fact for resolution at trial.[9]

### B. VIOLATION OF A CONSTITUTIONAL RIGHT UNDER THE STATE-CREATED DANGER THEORY

The Manuels allege that Banehoff, Knowlton, and Gill, by their conduct and actions during the under-

---

[5] *Spiek v Dep't of Transportation*, 456 Mich 331, 337; 572 NW2d 201 (1998); *Willis v Deerfield Twp*, 257 Mich App 541, 548; 669 NW2d 279 (2003).

[6] *Kefgen v Davidson*, 241 Mich App 611, 616; 617 NW2d 351 (2000).

[7] *Rice v Auto Club Ins Ass'n*, 252 Mich App 25, 31; 651 NW2d 188 (2002).

[8] *Id.* at 30-31.

[9] *Id.* at 31.

cover investigation, violated the Manuels' constitutional rights to be free from state-created danger under the Fourteenth Amendment of the United States Constitution.

Persons deprived of constitutional rights by individuals acting under color of state law have a civil remedy under 42 USC 1983,[10] which states in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

The statute provides no substantive rights in and of itself; rather, it merely supplies a remedy for violations of rights under other laws.[11] Thus, to establish a claim under § 1983, a plaintiff must show that a constitutional violation occurred.[12]

The Fourteenth Amendment Due Process Clause does not require a state "to protect the life, liberty, and property of its citizens against invasion by private actors."[13] Nevertheless, a state might still be liable for private acts of violence that result from the state's affirmative acts that greatly increase the risk of harm to

---

[10] *Dowerk v Oxford Charter Twp*, 233 Mich App 62, 74; 592 NW2d 724 (1998); *Davis v Wayne Co Sheriff*, 201 Mich App 572, 576; 507 NW2d 751 (1993).

[11] *Davis, supra* at 576.

[12] *Dean v Childs*, 262 Mich App 48, 53-54; 684 NW2d 894 (2004), rev'd in part on other grounds 474 Mich 914 (2005); *Kallstrom, supra* at 1060.

[13] *DeShaney v Winnebago Co Dep't of Social Services*, 489 US 189, 195; 109 S Ct 998; 103 L Ed 2d 249 (1989).

its citizens.[14] Courts have interpreted this exception as the "state-created danger theory of liability."[15] Liability under this theory may be imposed if a plaintiff shows:

> "1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; 2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and 3) the state knew or should have known that its actions specifically endangered the plaintiff."[16]

In response to the Manuels' claims, Banehoff, Knowlton, and Gill contended that they were entitled to qualified immunity. "When performing discretionary functions, government officials generally are shielded from civil liability so long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' "[17] "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.' "[18] In analyzing whether a state actor enjoys qualified immunity from suit, a court must first determine whether a constitutional violation occurred.[19] If so, the court must then consider "whether the violation in-

---

[14] *Id.* at 201-202; *Kallstrom, supra* at 1066.

[15] *Kallstrom, supra* at 1066; see also *Bukowski v City of Akron,* 326 F3d 702, 708-709 (CA 6, 2003).

[16] *Dean, supra* at 55, quoting *Cartwright v Marine City,* 336 F3d 487, 493 (CA 6, 2003).

[17] *Avalos v City of Glenwood,* 382 F3d 792, 798 (CA 8, 2004), quoting *Harlow v Fitzgerald,* 457 US 800, 818; 102 S Ct 2727; 73 L Ed 2d 396 (1982).

[18] *Saucier v Katz,* 533 US 194, 200; 121 S Ct 2151; 150 L Ed 2d 272 (2001), quoting *Mitchell v Forsyth,* 472 US 511, 526; 105 S Ct 2806; 86 L Ed 2d 411 (1985).

[19] *Ewolski v City of Brunswick,* 287 F3d 492, 501 (CA 6, 2002).

volved ' "clearly established constitutional rights of which a reasonable person would have known." ' "[20]

The Manuels rely on *Kallstrom*, in support of their argument that defendants Banehoff, Knowlton, and Gill deprived them of a constitutional right. In *Kallstrom*, the plaintiffs, three undercover police officers, conducted an undercover investigation involving a gang that led to the prosecution of 41 gang members. In the context of the prosecution of one gang member, a defense attorney requested plaintiff Kallstrom's personnel file, which was turned over. The other two plaintiffs suspected that their files were turned over as well. The files contained the plaintiffs' home addresses and telephone numbers, the addresses and telephone numbers of the plaintiffs' immediate family members, the plaintiffs' social security numbers, their bank account information, and copies of their drivers' licenses.[21] The plaintiffs filed suit, alleging, in part, that dissemination of their personal information violated their rights to be free from state-created danger under § 1983.[22]

The United States Court of Appeals for the Sixth Circuit agreed and held that the defendant city's actions in releasing the plaintiffs' information placed the plaintiffs and their families in "special danger" by "substantially increasing the likelihood that a private actor would deprive them of their liberty interest in personal security."[23] The federal court reasoned that anonymity is essential to police officers investigating gang-related activity and that by releasing the plaintiffs' confidential information, the city "placed the

---

[20] *Id.* (citations omitted).

[21] *Kallstrom, supra* at 1059.

[22] *Id.* at 1060, 1067.

[23] *Id.* at 1067.

personal safety of the officers and their family members, as distinguished from the public at large, in serious jeopardy."[24] The federal court further found that "[t]he City either knew or clearly should have known that releasing the officers' [personal information] to defense counsel . . . substantially increased the officers' and their families' vulnerability to private acts of vengeance."[25] Accordingly, the federal court held that the city's release of the information created "a constitutionally cognizable 'special danger,' giving rise to liability under § 1983."[26]

Unlike *Kallstrom*, in which the plaintiffs did not consent to the disclosure of their personnel files to criminal defense attorneys, the Manuels voluntarily participated in the undercover investigation that involved the conduct they now contend violated their constitutional rights to be free from state-created danger. This factor is significant and takes this case out of the realm of *Kallstrom*. As the trial court recognized, undercover operations are inherently dangerous, and defendants' conduct did not create any special danger beyond that normally involved in such an operation.

To support our conclusion that voluntary participation precludes liability under the state-created danger theory, we note decisions from the federal circuit courts of appeals that have addressed this issue in the context of undercover informants. In *Summar v Bennett*, the plaintiff's son was murdered after serving as a confidential informant in exchange for a plea agreement regarding a pending criminal charge.[27] The indictment issued as a result of the investigation identified the

---

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Summar v Bennett*, 157 F3d 1054, 1055-1056 (CA 6, 1998).

informant by name, and the informant was killed three or four days after the indictment was served.[28] The Sixth Circuit found it significant that the informant voluntarily elected to participate in the investigation despite the fact that he had been informed that he would ultimately have to testify and reveal his identity.[29]

In *Vélez-Díaz v Vega-Irizarry*, a government informant was murdered after cooperating with the FBI for nearly two months.[30] In exchange for favorable treatment regarding a drug charge, the informant agreed to participate in an undercover operation involving large-scale controlled substances and firearms transactions with a gang.[31] During a transaction, the informant wore a recording device that allowed the law enforcement officers to hear the informant repeatedly state that he was tired and wanted to leave. Shortly thereafter, one of the gang members shot and killed the informant.[32] Following *Summar*, the United States Court of Appeals for the First Circuit held that the plaintiffs had not alleged facts sufficient to support their claim under a state-created danger theory.[33] The federal court stated, "Plaintiffs' theory may be that the government owes a duty to all cooperating witnesses to protect them from harm. There are risks inherent in being a cooperating witness, but the state does not create those dangers, others do, and the witness voluntarily assumes those risks."[34] The federal court also stated that it left open the question whether liability would ensue if the state

---

[28] *Id.* at 1056.

[29] *Id.* at 1058-1059.

[30] *Vélez-Díaz v Vega-Irizarry*, 421 F3d 71, 73-74, 81 (CA 1, 2005).

[31] *Id.* at 73-74.

[32] *Id.* at 74.

[33] *Id.* at 81.

[34] *Id.*

actor "takes certain actions, such as sending a cooperating witness to what the state knows would be his certain death," but determined that the facts at issue did not come close to such a circumstance.[35] Thus, the federal court determined that, absent a showing that the government conduct violated a constitutional right, qualified immunity applied.[36]

However, we acknowledge that in analogous circumstances, the United States Court of Appeals for the Seventh Circuit reached an opposite conclusion.[37] In *Monfils v Taylor*, the victim, Thomas Monfils, notified the police that a coworker, Keith Kutska, intended to steal an electrical cord from the paper mill where they worked. The police notified the security personnel at the plant, who attempted to search Kutska on his way out of the plant, but Kutska refused and was consequently suspended for five days. Thereafter, Kutska attempted to obtain a copy of the tape recording of Monfils's call to the police in order to identify the informant.[38] Monfils repeatedly telephoned the police to prevent release of the tape to Kutska because he feared retribution from Kutska if his identity was revealed.[39] Ultimately, Monfils spoke with defendant Deputy James Taylor, who assured Monfils that the tape would not be released.[40] Despite his assurances, Taylor did not prevent release of the tape, and Kutska and others murdered Monfils.[41] In response to the plaintiffs' claim

---

[35] *Id.*

[36] *Id.*

[37] *Monfils v Taylor*, 165 F3d 511 (CA 7, 1998).

[38] *Id.* at 513.

[39] *Id.* at 513-514.

[40] *Id.* at 514.

[41] *Id.* at 513, 515.

under a state-created danger theory, Taylor asserted qualified immunity.[42] The federal court held that sufficient evidence was presented in the trial court to uphold a verdict against Taylor on the basis that he violated Monfils's substantive due process rights.[43] The federal court reasoned that, "[a]s an experienced police officer, Taylor knew the dangers informants face."[44] The federal court further stated that, by failing to follow through with his assurance that the tape would not be released, Taylor created a danger to Monfils that he would not otherwise have faced.[45] Further, without analyzing whether Monfils's right was "clearly established," for purposes of qualified immunity, the federal court stated, "Taylor is not and never was entitled to qualified immunity against this claim."[46]

Whether a confidential informant may bring an action under § 1983 using a state-created danger theory is an issue of first impression in Michigan. Michigan cases addressing the state-created danger concept have involved circumstances distinct and distinguishable from cases involving confidential informants.[47] And the fact

---

[42] *Id.* at 518.

[43] *Id.* at 520.

[44] *Id.*

[45] *Id.* at 518.

[46] *Id.*

[47] See *Dean, supra* at 51-52 (action against fire fighter and township for death of four children in a fire); *Conley v Bobzean,* unpublished opinion per curiam of the Court of Appeals, issued January 12, 2006 (Docket No. 257276) (action against city and others for failure to detain decedent while intoxicated); *Rollo v Guerreso,* unpublished opinion per curiam of the Court of Appeals, issued August 25, 2005 (Docket No. 251826) (action on behalf of developmentally disabled child left in custody of mother who died from alcohol abuse); and *Fortune v Detroit Public Schools,* unpublished opinion per curiam of the Court of Appeals, issued October 12, 2004 (Docket No. 248306) (involving sexual assault of seventh-grade girl following after-school event).

that confidential informants voluntarily participate in the conduct alleged to have violated their constitutional rights takes this case out of the realm of other cases alleging liability on a state-created danger theory. Therefore, we find persuasive the analyses of *Summar* and *Vélez-Díaz*, which held that confidential informants assume the risks inherent in participating in an undercover investigation.[48] And it is this voluntary participation standard that compels us to find *Monfils* distinguishable. Although Monfils reported the theft, we cannot equate Monfils's tip to the police with the knowing participation of the undercover informants in *Summar*, *Vélez-Díaz*, and here.

Adopting the reasoning of *Summar* and *Vélez-Díaz*, we hold that the Manuels' allegations fail to establish a constitutional violation. Indeed, even more compelling in this case is the fact that the Manuels' participation was not in exchange for favorable treatment regarding pending criminal charges; rather, it was for their own personal reasons, namely, a general sense of civic duty and Iskandar's concern for his son who had previously purchased drugs. It does not appear that Iskandar or the remaining plaintiffs at any time sought to terminate their participation in the operation. We therefore conclude that the Manuels voluntarily assumed the risks inherent in the operation.

The Manuels also argue that only Iskandar, rather than all the plaintiffs, agreed to participate in the investigation. But the remaining plaintiffs cannot establish that defendants engaged in affirmative acts that

---

[48] *Vélez-Díaz, supra* at 81; *Summar, supra* at 1059-1060. While a possible exception may exist if a state actor sends an informant to what is known to be the informant's certain death, *Vélez-Díaz, supra* at 81, that situation is not presented in this case.

either created the risk or increased the risk that they would be exposed to acts of violence by third parties, that defendants' acts specifically put them at risk, or that these individual defendants knew or should have known that their actions specifically endangered the remaining plaintiffs.[49] To the extent that Iskandar's participation endangered the remaining plaintiffs, Iskandar, rather than defendants, was responsible for any increased danger to them. Thus, these remaining plaintiffs cannot establish a constitutional violation even if they did not personally assume the risk inherent in the undercover operation.

Moreover, even if the Manuels could establish a constitutional violation, Banehoff, Gill, and Knowlton would be entitled to qualified immunity. It does not appear that these defendants violated " 'clearly established statutory or constitutional rights of which a reasonable person would have known.' "[50] A right is "clearly established," if it is clear that a reasonable official would understand that his conduct violates that right.[51] As previously stated, although the action in question need not have been previously held to be unlawful, the unlawfulness of the conduct must be apparent in light of preexisting law.[52] Accordingly, Banehoff, Gill, and Knowlton have qualified immunity.

The Manuels also alleged liability on the part of the various county defendants, the Lansing defendants, the TCM, and Patrick on theories that their customs, policies, omissions, and failures to train or supervise TCM officers exposed the Manuels to state-created danger. For there to be liability on the part of a

---

[49] *Dean, supra* at 55.

[50] *Avalos, supra* at 798, quoting *Harlow, supra* at 818.

[51] *Ewolski, supra* at 501.

[52] *Id.*

municipality, an underlying constitutional violation must exist. Absent such an underlying violation, there can be no liability against a municipality.[53] Accordingly, because no underlying violation exists, the trial court properly dismissed the Manuels' claims against the municipality defendants. And while the TCM and Patrick are not "municipalities," the absence of an underlying constitutional violation precludes liability on the part of the TCM and Patrick for the same reason.

Because the Manuels' failed to allege a constitutional violation based on a state-created danger, the Manuels failed to state a claim under § 1983. Thus, the trial court properly granted summary disposition on the Manuels' § 1983 claims.

## C. BREACH OF EXPRESS OR IMPLIED CONTRACT

In their amended complaint, the Manuels alleged that Gill and Knowlton, on behalf of the TCM, assured Iskandar "that he would be reimbursed for any expenses or losses suffered by the family business as a result of [Iskandar's] participation" in the operation. The Manuels alleged that Iskandar repeatedly sold cars to drug traffickers and their friends during the operation and that many of the cars were never returned or were repossessed, which resulted in losses for the business. The Manuels also alleged that Iskandar paid substantial cell phone bills for phones furnished during the investigation and that he was instructed to sell his Rolex watch worth $12,000 to a target of the operation so that the individual could be arrested. The Manuels alleged that the TCM did not fully reimburse them for their losses.

---

[53] *Bukowski, supra* at 712-713; *Doe v Claibourne Co*, 103 F3d 495, 505 (CA 6, 1996).

The trial court determined that the Manuels pleaded their claim in the most conclusory terms and, therefore, failed to state a valid claim as a matter of law. We conclude, however, that the Manuels' allegations were sufficient to state a claim for breach of contract because they supported their claim with factual allegations that, if true, would support a claim for breach of contract. Because a motion under subrule C(8) is properly granted only if no factual development could justify recovery, the trial court erred to the extent that it ruled that the Manuels' allegations failed to state a claim.[54]

The trial court also took issue with the fact that the Manuels did not produce a writing establishing the agreement with the TCM, concluding that the statute of frauds barred the enforcement of any agreement. We conclude, however, that a writing was not required under the statute of frauds because nothing indicates that the agreement could not have been performed within one year.[55] Moreover, the trial court ruled that the statute of frauds bars enforcement of any oral agreement regarding reimbursement of costs incurred by third parties. In this regard, MCL 566.132(1)(b) requires a writing concerning agreements involving "[a] special promise to answer for the debt, default, or misdoings of another person." Case law has interpreted this provision to apply only to collateral promises for debts already owed. A promise to pay for goods or services to be rendered in the future, however, is an original, rather than a collateral, promise, and is not

---

[54] *Johnson-McIntosh v Detroit,* 266 Mich App 318, 322; 701 NW2d 179 (2005).

[55] MCL 566.132(1)(a) (requiring agreements that by their terms cannot be performed within one year be in writing and signed by the party to be charged).

within the statute of frauds.[56] In the instant case, the Manuels alleged that to induce Iskandar to assist in the operation, Gill and Knowlton, on behalf of the TCM, assured Iskandar that he would be reimbursed for any expenses or losses incurred "as a result of his participation." Thus, the alleged promise was original rather than collateral, and the agreement was not within the statute of frauds. Accordingly, no writing was required, and the trial court erred to the extent that it granted summary disposition on this ground.

But the trial court properly determined that the TCM is a juridical entity capable of being sued. The TCM argues that it is not an entity capable of being sued because it is merely a task force comprised of various law enforcement agencies. We agree with the trial court that, pursuant to MCL 124.507(2) and the TCM interagency agreement, the TCM is, in fact a juridical entity. More specifically, the plain language of the statute provides that "[t]he entity may sue and be sued in its own name."[57] Further, article I, § VIII of the agreement expressly addresses liability insurance and legal representation for civil suits "arising out of activities performed by TCM" and how any resultant judgments are to be handled. Therefore, the TCM is an entity capable of being sued. Importantly, because the TCM is operated under the direction and supervision of the MSP, we conclude that the TCM is equivalent to a state agency. But because the TCM is equivalent to a state agency, jurisdiction was not proper in the circuit court; claims against the state must be filed in the

---

[56] *Schier, Deneweth & Parfitt, PC v Bennett*, 206 Mich App 281, 282; 520 NW2d 705 (1994); *Gillhespy v Bolema Lumber & Bldg Supplies, Inc*, 5 Mich App 351, 355; 146 NW2d 666 (1966).

[57] MCL 124.507(2).

Court of Claims.[58] Accordingly, albeit for the wrong reason,[59] the trial court properly granted summary disposition for the TCM on the Manuels' breach of contract claim.

### D. GROSS NEGLIGENCE

Pursuant to MCL 691.1407(2)(b) and (c), governmental employees are immune from suit "if they were acting within the scope of their authority, were 'engaged in the exercise or discharge of a governmental function,' and their conduct did not 'amount to gross negligence that is the proximate cause of the injury or damage.' "[60] The Legislature amended MCL 691.1407(2)(c) in 1986 to require that a government employee's actions be "the" proximate cause of a plaintiff's injury, as opposed to "a" proximate cause of an injury.[61] And in *Robinson v Detroit*, the Michigan Supreme Court interpreted MCL 691.1407(2)(c) to "provide[] tort immunity for employees of governmental agencies unless the employee's conduct amounts to gross negligence that is the one most immediate, efficient, and direct cause of the injury or damage, i.e., the proximate cause."[62]

*Robinson* involved persons injured in two police chases.[63] The Michigan Supreme Court held that the police officers involved in the chases were immune from tort liability under MCL 691.1407(2) because their pursuit of the fleeing vehicles was not the proximate

---

[58] MCL 600.6419.

[59] *Amerisure Ins Co v Auto-Owners Ins Co*, 262 Mich App 10, 21; 684 NW2d 391 (2004).

[60] *Miller v Lord*, 262 Mich App 640, 644; 686 NW2d 800 (2004), quoting MCL 691.1407(2)(b) and (c).

[61] 1986 PA 175; *Miller, supra* at 644.

[62] *Robinson v Detroit*, 462 Mich 439, 462; 613 NW2d 307 (2000).

[63] *Id.* at 447-449.

cause of the plaintiffs' injuries. Rather, "[t]he one most immediate, efficient, and direct cause of the plaintiffs' injuries was the reckless conduct of the drivers of the fleeing vehicles."[64] This Court reached a similar result in *Miller v Lord*, which involved a high school student who was sexually assaulted by a fellow student.[65] In determining whether two teachers were immune from tort liability, this Court determined that the teachers' conduct was not the proximate cause of the victim's injuries and that "the immediate, direct cause preceding [the victim's] injuries was the alleged sexual assault . . . ."[66]

As in *Robinson* and *Miller*, the proximate cause of the alleged injuries here was not the conduct of Gill, Knowlton, or Patrick. Rather, the most immediate, direct cause of any injuries was the threatening conduct of the targets of the undercover operation. Because the officers' conduct was not "the" proximate cause of plaintiffs' alleged injuries, the officers are immune from liability under MCL 691.1407(2). Therefore, summary disposition for those defendants on the Manuels' claims of gross negligence was proper.

With respect to Banehoff, the Manuels' claim focuses solely on their allegation that Banehoff disclosed to "Edward" that the Manuels were participating in the investigation. This alleged conduct arguably was not within the scope of employment or within the exercise or discharge of a governmental function. Thus, MCL 691.1407(2) arguably does not provide governmental immunity from the Manuels' gross negligence claim against Banehoff. Summary disposition for Banehoff would have been proper, however, under MCR

---

[64] *Id.* at 462.

[65] *Miller, supra* at 642.

[66] *Id.* at 644.

2.116(C)(10). In his affidavit, Banehoff denied telling "Edward" or anyone other than law enforcement personnel that Iskandar was involved in the investigation. The Manuels did not produce any evidence in response to Banehoff's affidavit. Rather, the only statement in Iskandar's affidavit that could possibly be said to counter Banehoff's affidavit is Iskandar's contention that another associate of the targeted drug dealer telephoned him the day after the alleged meeting between Banehoff and "Edward" and asked how the TCM knew all the details of the transaction that Iskandar had arranged the previous day. Such a statement does not constitute admissible evidence rebutting Banehoff's affidavit specifically denying that he informed anyone of Iskandar's involvement in the investigation.[67] Because the Manuels failed to produce any admissible evidence in response to Banehoff's affidavit, summary disposition was proper under MCR 2.116(C)(10). To the extent that the trial court relied on MCR 2.116(C)(8), this Court will not reverse a correct decision reached for the wrong reasons.[68]

### E. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

To the extent that the Manuels alleged grossly negligent infliction of emotional distress, Gill and Knowlton are immune from suit pursuant to MCL 691.1407(2) for the same reason as discussed above, that is, the officers' conduct was not the proximate cause of the Manuels' injuries.

---

[67] Iskandar's affidavit does not aver that Banehoff disclosed Iskandar's identity to "Edward," as alleged in plaintiffs' amended complaint. Rather, Iskandar averred that Banehoff informed a friend that Banehoff "had arranged a deal, where drugs and cash would be exchanged for a car at a car dealership." Thus, Iskandar's own affidavit fails to support the allegations in the Manuels' amended complaint.

[68] *Amerisure, supra* at 21.

To the extent that the Manuels alleged intentional infliction of emotional distress, we conclude that the trial court properly determined that the Manuels' amended complaint failed to state a valid claim of intentional infliction of emotional distress. In order to establish this cause of action, a plaintiff must establish

"(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. Liability attaches only when a plaintiff can demonstrate that the defendant's conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."[69]

The conduct alleged in the Manuels' amended complaint cannot be considered so outrageous and extreme as to surpass all possible bounds of decency. Further, the alleged conduct cannot be regarded as atrocious or utterly intolerable in a civilized community. Rather, it appears from the Manuels' allegations that, for the most part, they simply disagree with how the undercover investigation was being conducted. Even to the extent that Banehoff's alleged conduct could be said to be outrageous, summary disposition in his favor was proper under MCR 2.116(C)(10), again because the Manuels failed to establish a genuine issue of material fact for trial.

### III. REQUEST TO AMEND COMPLAINT

Generally, leave to amend a complaint should be freely granted when justice requires.[70] Leave to amend should be denied, however, if amendment would be

---

[69] *Heckmann v Detroit Chief of Police*, 267 Mich App 480, 498; 705 NW2d 689 (2005) (citation omitted).

[70] MCR 2.118(A)(2); *Tierney v Univ of Michigan Regents*, 257 Mich App 681, 687; 669 NW2d 575 (2003).

futile.[71] During one of the various hearings below, the Manuels' attorney asked to amend their complaint "[a]s far as the proximate cause issue and gross negligence" issue. It appears that counsel was requesting to amend the complaint to allege that the officers' conduct was *the* proximate cause of the Manuels' injuries as opposed to *a* proximate cause of the Manuels' injuries. As previously discussed, the officers' conduct was not the proximate cause of the Manuels' injuries. Rather, the threatening conduct of the targets of the investigation was the proximate cause. Thus, any amendment would have been futile.

The Manuels also requested to amend their complaint in the "relief requested" section of their response to the motions for summary disposition of the Lansing defendants and the Ingham County defendants. The Manuels did not specify what an amendment would accomplish or what their amended allegations would state. Accordingly, we conclude that the Manuels have not shown plain error affecting their substantial rights.[72]

### IV. CONCLUSION

In sum, we conclude that the trial court properly granted summary disposition for defendants on all of the Manuels' claims.

We affirm.

---

[71] MCR 2.118(A)(2); *Tierney, supra* at 687-688.

[72] See *Hilgendorf v St John Hosp & Med Ctr Corp*, 245 Mich App 670, 700; 630 NW2d 356 (2001).