DAVIS v WAYNE COUNTY SHERIFF

Docket No. 122594. Submitted July 7, 1993, at Detroit. Decided
September 20, 1993, at 9:45 A.M.

Diana Davis, for herself and as next friend of her minor children,
Danielle Y. and Marc A. Davis, and Tod A. Wilson, for himself
and as personal representative of the estate of his deceased
wife, Kimberly S. Wilson, brought an action in the Wayne
Circuit Court against Wayne County Sheriff Robert Ficano. The
plaintiffs alleged that a shooting rampage, in which Kimberly
Wilson died, Diana Davis sustained injuries that rendered her a
paraplegic, and Tod Wilson was seriously injured, by Marc
Davis, estranged husband of Diana Davis and a Wayne County
sheriff's deputy, while off duty deprived them of their federal
constitutional rights as protected by 42 USC 1983. The plain-
tiffs claimed that the defendant failed to train and supervise
employees in the use and control of department-issued weap-
ons; failed to provide adequate psychological and social counsel-
ing programs specific to the stress suffered by police officers;
permitted, encouraged, or otherwise failed to disallow a depart-
mental "code of silence" among employees that interfered with
the monitoring and correction of employee misconduct; and
failed to supervise and select employees adequately through
periodic evaluations and other screening methods. Following a
jury trial in which the court, J. Phillip Jourdan, J., denied
motions by the defendant for a directed verdict and judgment
notwithstanding the verdict, a judgment consistent with the
verdict was entered in favor of, and damages were awarded to,
Diana Davis in her individual capacity and Tod Wilson in his
individual and representative capacities. The defendant ap-
pealed, and the plaintiffs cross appealed.

The Court of Appeals *held:*

1. Liability under 42 USC 1983 may be imposed on a police

REFERENCES

Am Jur 2d, Civil Rights §§ 16, 20.
Defense of good faith in action for damages against law enforce-
ment official under 42 USCS sec. 1983, providing for liability of
person who, under color of law, subjects another to deprivation of
rights. 61 ALR Fed 7.

agency or its director for an officer's off-duty conduct that results in death or bodily injury to citizenry only where that conduct is directly related to a policy adopted, or not adopted, with deliberate indifference to the rights of citizens. No liability under § 1983 may be imposed where the agency's policy, or lack of policy, merely reflects a negligent failure to train or supervise its officers. The record in this case fails to indicate a direct link between the shooting rampage and the defendant's alleged failure to train, supervise, or otherwise screen employees. Assuming that such a link exists, the defendant's alleged failures constituted only negligence, not deliberate indifference. Accordingly,[b] no liability under § 1983 can be imposed on the defendant, and the trial court erred in denying the defendant's motions for a directed verdict and judgment notwithstanding the verdict.

2. The trial court did not abuse its discretion in refusing to allow the plaintiffs to treat former Wayne County Sheriff William Lucas as an adverse witness under MCL 600.2161; MSA 27A.2161. Because Lucas was no longer connected with the sheriff's department at the times pertinent to this action, the statute did not apply to him.

3. The trial court did not abuse its discretion in excluding as irrelevant the testimony of a criminal suspect who allegedly was mistreated by Marc Davis. The plaintiffs' offer of proof with respect to that proffered witness did not indicate that the witness could establish any wrongdoing by Marc Davis that was attributable to the defendant.

Reversed and remanded for entry of judgment in favor of the defendant.

CIVIL RIGHTS — VIOLATIONS BY POLICE AGENCIES — TRAINING AND SUPERVISION OF OFFICERS — DELIBERATE INDIFFERENCE.

Liability under 42 USC 1983 may be imposed on a police agency or its director for an officer's off-duty conduct that results in death or bodily injury to citizenry only where that conduct is directly related to a policy adopted, or not adopted, with deliberate indifference to the rights of citizens; no liability may be imposed where the agency's policy, or lack of policy, merely reflects a negligent failure to train or supervise its officers.

*Hugh M. Davis, Jr.,* for Diana Davis.

*Robert Horvath,* for Tod A. Wilson.

*Saul A. Green,* Corporation Counsel, *Mary S.*

*Rowan,* Assistant Counsel, and *Garan, Lucow, Miller, Seward, Cooper & Becker* (by *James G. Gross, Mary T. Nemeth,* and *Rosalind Rochkind*), for Wayne County Sheriff Robert Ficano.

Before: DOCTOROFF, C.J., and MICHAEL J. KELLY and GRIBBS, JJ.

DOCTOROFF, C.J. Following a lengthy jury trial, plaintiffs were awarded various amounts of money in relation to their claims against the Wayne County Sheriff, Robert Ficano (hereafter the defendant), premised upon alleged violations of their constitutional rights as protected by 42 USC 1983.[1] Defendant appeals the June 13, 1989, judgment incorporating the terms of the verdict, and plaintiffs cross appeal, each raising a number of issues. We reverse and remand to the trial court for entry of judgment in favor of defendant.

The facts giving rise to plaintiffs' claims are tragic and essentially undisputed.[2] Marc Davis (hereafter Davis) was employed by the County of Wayne as a deputy sheriff under the supervision of defendant. His wife, Diana Davis (hereafter Diana), was also employed by Wayne County under defendant's supervision and was nearing completion of the deputy sheriff training academy. Diana and Davis had been experiencing marital difficulties and were separated at the time of the incident. Diana and her two children were living with

[1] Throughout this opinion, we will use "defendant" to refer exclusively to Robert Ficano, who was sued in his official capacity as sheriff of Wayne County. See *Monell v New York City Dep't of Social Services,* 436 US 658, 691, n 54; 98 S Ct 2018; 56 L Ed 2d 611 (1978). Where appropriate, the other parties that were named as defendants will be referred to in the specific manner designated in the opinion.

[2] Throughout this opinion, we will use "plaintiffs" to refer to all of the parties to the 42 USC 1983 claim. Where appropriate, we will designate the individual plaintiffs by their names as specified in the opinion.

her half-sister, Kimberly Wilson (hereafter Kim), and Kim's husband, Tod Wilson (hereafter Tod). While off duty on the night of September 18, 1983, Davis came to the Wilson residence. An argument between Davis and Diana ensued. At one point, a Garden City police officer was dispatched to the scene to investigate the disturbance. After Diana assured the officer that she was not in danger, the officer left the scene.

About a half hour later, the argument again became heated. Tod and Kim also became engaged in the argument and attempted to offer Diana assistance. Testimony revealed that Davis had opened the trunk of Diana's car and began throwing her personal belongings on the Wilsons' driveway and front yard. Diana made some comments to the effect that she would take everything Davis had, including his job. At this point, Davis produced his service revolver and began shooting. As a result of the shooting rampage, Kim was killed, Tod was seriously wounded, and Diana was rendered a paraplegic. Davis was later convicted of various crimes related to the shooting, and all of the victims filed this action claiming, among other things, that they had been deprived of their constitutional rights as protected under 42 USC 1983.

Initially, plaintiffs named Wayne County and defendant jointly, arguing common-law negligence. However, following a motion for summary disposition under MCR 2.116(C)(7), the court dismissed Wayne County pursuant to the doctrine of governmental immunity. The court also dismissed the negligence count against defendant on the same ground. Davis was initially named as a defendant in the suit, but was dismissed before trial, apparently pursuant to the provisions of a settlement. Plaintiffs proceeded to trial against defendant solely upon the theory that defendant violated

their constitutional rights by adopting and maintaining departmental policies that precluded defendant from recognizing the danger attendant to Davis' continued possession and use of a firearm. Following a four-week trial, the jury awarded Diana $803,416, Kim's estate $651,752, Tod $50,000, and no recovery for the Davis' children.[3] We reverse the verdict and remand for entry of judgment in favor of defendant.

Pursuant to its terms, 42 USC 1983 provides a remedy against any person who, under color of state law, deprives another of the rights protected by the Constitution. *Collins v Harker Heights,* 503 US —; 112 S Ct 1061, 1066; 117 L Ed 2d 261 (1992); *Monell v New York City Dep't of Social Services,* 436 US 658, 690; 98 S Ct 2018; 56 L Ed 2d 611 (1978). The statute creates no substantive rights, but instead merely supplies a remedy for deprivation of rights created by other laws. *Graham v Connor,* 490 US 386, 393-394; 109 S Ct 1865; 104 L Ed 2d 443 (1989); *York v Detroit (After Remand),* 438 Mich 744, 757-758; 475 NW2d 346 (1991). Liability under this section must be premised upon more than the fact that the municipality employs a tortfeasor. *Monell, supra* at 691. In other words, respondeat superior is not a sufficient theory upon which to premise liability. *Id.*; Schuck, *Municipal liability under Section 1983: Some lessons from tort law and organization theory,* 77 Geo L J 1753 (1989).

A cause of action under § 1983 is stated where a plaintiff shows (1) that the plaintiff was deprived of a federal right, and (2) that the defendant

---

[3] The children's claims were obviously derivative because they were not physically injured or present at the time of the shooting. On cross appeal, the lack of recovery for the children is also raised as an issue. However, for reasons that will become apparent, the argument is moot.

deprived the plaintiff of that right while acting under color of state law. *Mollett v Taylor,* 197 Mich App 328, 344; 494 NW2d 832 (1992). In order to establish such a claim against a municipality or an agency thereof, the plaintiff must show that a policy or custom tantamount to a deliberate indifference for the constitutional rights of others actually caused the violation. *Canton v Harris,* 489 US 378, 381; 109 S Ct 1197; 103 L Ed 2d 412 (1989); *Monell, supra* at 691 and n 5; *York, supra* at 758. Our Supreme Court has held that deliberate indifference requires something more than mere negligence. *York, supra* at 757 (relying on *Estelle v Gamble,* 429 US 97, 104; 97 S Ct 285; 50 L Ed 2d 251 [1976], reh den 429 US 1066 [1977]).

Defendant's first contention is that plaintiffs failed to state a claim under § 1983 because Davis was acting outside the scope of his employment and, thus, not under color of state law when he shot the victims. It is true that in order to impose liability there must be a deprivation under color of state law. *Adickes v S H Kress & Co,* 398 US 144, 150; 90 S Ct 1598; 26 L Ed 2d 142 (1970). However, defendant's argument that Davis was not acting under color of state law when he shot the victims is not dispositive of the claim against defendant.

Defendant is correct that, ultimately, plaintiffs' alleged violations resulted from Davis' shooting the victims while off duty. However, Davis was already dismissed from the suit and was not named as a defendant in the § 1983 action. Instead, plaintiffs' theory of recovery under § 1983 was premised upon the assertion that Davis' conduct was directly attributable to the policies adopted or not adopted by defendant. Specifically, plaintiffs' claim was based on the notion that defendant should have recognized Davis' propensity for violence and should have discharged him

from his position as a deputy or at least taken away his service revolver.

A recent federal decision offers guidance in this regard. In *Gibson v Chicago,* 910 F2d 1510 (CA 7, 1990), a police officer who had been declared unfit for duty and stripped of his powers as an officer shot and killed Gibson with his department-issued revolver. The federal appeals court concluded that it was proper for the trial court to summarily dismiss the police officer from the § 1983 action because he was not acting under color of state law when he shot Gibson. *Id.* at 1519. Nonetheless, the court reversed the trial court's decision to summarily dismiss the City of Chicago from the § 1983 action because the plaintiff had alleged that the city had adopted policies that also contributed to the violations. The court concluded that there were sufficient factual allegations in the plaintiff's complaint to survive summary disposition even though it was clear that the police officer was acting without lawful authority when the shooting occurred. *Id.* at 1519-1523. See also *Stoneking v Bradford Area School Dist,* 882 F2d 720 (CA 3, 1989), cert den sub nom *Smith v Stoneking,* 493 US 1044 (1990).

As in *Gibson,* plaintiffs' claim against defendant is based upon defendant's formulation of policy regarding the operation of the department and supervision of officers. Defendant does not, and indeed cannot, argue that the formulation of policy within the department is done outside the color of state law. See *Gibson, supra* at 1519 ("[T]he municipality itself is the state actor and its action in maintaining the alleged policy at issue supplies the 'color of law' requirement under § 1983."). Therefore, we agree with plaintiffs that defendant's assertion that Davis was not acting under color of state law does not automatically imply

that defendant is absolved from § 1983 liability. We do not believe that it is appropriate to mesh the "color of law" issue with the causation issue. Accordingly, while we agree with defendant's argument that the violations asserted by plaintiffs were not *caused by the policies* adopted by defendant, we address that argument separately. For purposes of addressing the "color of law" issue, we assume that the policies caused the violations at issue. See *Stengel v Belcher,* 522 F2d 438, 441 (CA 6, 1975). But see *Bonsignore v New York,* 683 F2d 635 (CA 2, 1982).

Defendant's next argument is that the court should have granted a directed verdict or judgment notwithstanding the verdict because plaintiffs, as a matter of law, failed to present sufficient evidence to support a cause of action under § 1983 against the department. At the conclusion of plaintiffs' proofs, defendant moved for a directed verdict and, following the verdict, defendant moved for a judgment notwithstanding the verdict. The court denied both motions.

In evaluating a directed verdict or a judgment notwithstanding the verdict, we are obligated to consider the evidence in a light most favorable to the nonmoving party. *Bradley v Philip Morris, Inc (On Remand),* 199 Mich App 194, 197; 501 NW2d 246 (1993). If the evidence is such that reasonable minds could differ, then judgment notwithstanding the verdict is improper. *Constantineau v DCI Food Equipment, Inc,* 195 Mich App 511, 515; 491 NW2d 262 (1992). In this case, considering the evidence presented in a light most favorable to plaintiffs, we are persuaded that the record, as a matter of law, was insufficient to support a conclusion that reasonable minds could differ regarding whether plaintiffs suffered a § 1983 violation caused by a policy of indifference adopted by defendant. Ac-

cordingly, we reverse the verdict in favor of plaintiffs and remand for entry of judgment in favor of defendant.

Perhaps as much as any area of § 1983 jurisprudence, the liability attached in conjunction with a municipal policy or custom has created confusion and controversy in the courts. Shuck, *supra* at 1753-1754. In *Canton, supra,* the Supreme Court attempted to clarify the parameters of policy-related § 1983 liability, this time in the context of a municipality's failure to adequately train its police officers. *Canton, supra* at 382. The Court acknowledged that there are situations where a municipality's failure to train its employees can provide a basis for liability under § 1983. *Id.* at 387. Recognizing the direct causal connection that must exist between the policy or failure to train and the violation, the Court concluded that the failure to train must reflect a " 'deliberate' or 'conscious' choice" to follow a certain course of action that results in a violation. *Id.* at 389. The Court further stated that the plaintiff must demonstrate that the need for training is so obvious, and the inadequacy so likely to cause a violation, that an inference of deliberate indifference may be made. *Id.* at 390; *Barber v Salem,* 953 F2d 232, 236 (CA 6, 1992).

In *Oklahoma City v Tuttle,* 471 US 808, 824; 105 S Ct 2427; 85 L Ed 2d 791 (1985), Justice Rehnquist (joined by three other justices), wrote:

> But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the "policy" and the constitutional deprivation.

In a footnote, Justice Rehnquist went on to suggest that there must be an "affirmative link" between

the alleged training inadequacies and the violation at issue before liability could be found. *Id.* at n 8. While not all federal courts have expressly adopted the "affirmative link" requirement, the Sixth Circuit has cited it with approval. See *Lewis v Irvine,* 899 F2d 451, 456 (CA 6, 1990). Regardless of how the causation element is described, it is clear that there must be some connection between the failure to train and the violation that permits an inference of deliberate indifference. *Collins,* 112 S Ct 1068.

Just as our Supreme Court applied the *Canton* "deliberate indifference" standard to a deprivation of rights in the context of inmate suicide, *York, supra* at 759-760, we believe that liability for an officer's off-duty conduct that results in death or bodily injury to citizenry may only be imposed where that officer's conduct is directly related to a policy, or lack of policy, adopted, or not adopted, with deliberate indifference to the rights of citizens. Accordingly, no § 1983 liability should be imposed where the department's policy or lack of policy merely reflects a negligent failure to train or supervise its employees. *Id.*

Given the conclusion that the need for training or other departmental action must be obvious, *Canton, supra* at 390, we believe that there·must be some knowledge on the part of the defendant that an off-duty officer is likely to commit a violation and, yet, the defendant fails to take steps to prevent that officer from so doing. *York, supra* at 757 ("Deliberate indifference contemplates knowledge, actual or constructive, and a conscious disregard of a *known* danger." [emphasis supplied].); *Hays v Jefferson Co,* 668 F2d 869, 874 (CA 6, 1982). It is against this backdrop that we turn to the allegations of § 1983 liability in this case.

Essentially, plaintiffs relied upon four separate

areas of department policy or inaction in asserting their claims for violation of § 1983. First, plaintiffs claimed that defendant failed to train and supervise employees in the use and control of their department-issued weapons. As part of this assertion, plaintiffs offered substantial proofs regarding defendant's twenty-four-hour duty policy, during which deputies were to carry their service revolvers. Second, plaintiffs claimed that defendant failed to provide adequate psychological and social counseling programs specific to the unique stress suffered by police officers. Third, plaintiffs claimed that defendant permitted, encouraged, or otherwise failed to disallow a departmental "code of silence" that interfered with the ability to properly monitor and correct misconduct of departmental employees. Finally, plaintiffs claimed that defendant failed to adequately supervise and select employees through the use of periodic written evaluations and other screening methods.

Plaintiffs relied on specific instances of alleged "misconduct" committed by Davis, including but not limited to the following: (1) that Davis received a reckless driving ticket before he was hired; (2) that Davis was seen coming out of the kitchen of the Detroit House of Corrections with blood on his hands and pants, which Davis explained as chicken blood; (3) that Davis intervened in a fight between a couple in a restaurant while he was off duty; (4) that Davis was seen by a deputy entering an inmate's cell and that the deputy heard sounds indicative of the prisoner being beaten; (5) that a deputy noticed what appeared to be a bullet hole in his locker and briefcase and that Davis offered to pay for the damage, suggesting that Davis was responsible for discharging his weapon in the locker room; (6) that, after an inmate punched Davis, the officers had to separate Davis from the

inmate to keep him from retaliating; (7) that a deputy saw Davis talking to another deputy in the cafeteria and subsequently saw Davis take his gun out of his holster and place it against the deputy; (8) that a deputy saw Davis threaten to beat Diana if she did not hand over his paycheck; and (9) that Davis while on county property was intoxicated and apparently ran his motorcycle into a brick wall.

Significantly, the incidents mentioned above were, for the most part, admittedly never reported through the chain of command, and each person responsible for disciplining Davis testified that they had no knowledge of the alleged misconduct. Moreover, the incidents addressed above (and the other less significant incidents presented at trial) took place over an extended period spanning the course of Davis' eight-year career. To the extent that Davis inflicted physical abuse on Diana while off duty, she admitted that she did not tell her superiors at the department about the abuse because she was afraid it would adversely affect her position with the department and possibly cost Davis his job. She admitted that no one in the department left her with that impression. Diana further testified that the only time she remembered discussing the abuse was with a friend in strict confidence. Most of the testimony, including that of plaintiffs' expert, suggested that deputies only had a duty to report personal problems when those problems adversely affected a deputy's work.

Even if we were to take as fact that Davis' activity before the night of the shooting should have been reported, there is nothing in the record to suggest that defendant dissuaded or furthered the failure of the deputies to report the activity. Almost without exception, employees and administrators within the department testified that the so-

called code of silence was in no way a policy of the office. In fact, the testimony suggested that defendant had adopted training procedures and informal directives to supervisors to infiltrate and break down any barriers that might exist between themselves and the deputies for whom they were responsible. Absent some evidence that the department deliberately furthered the code of silence, or was consciously indifferent to its existence, it cannot be said to be a departmental policy. On this record, there is no such evidence.

Furthermore, in this case, we perceive no link between the tragic events that occurred on September 18, 1983, and defendant's alleged failure to train, supervise, or otherwise screen its employees. Assuming, arguendo, that defendant's alleged failure to train and supervise amounted to a policy of deliberate indifference (an assumption we expressly reject on the basis of the evidence presented), we are still not persuaded that the violations that took place were caused by those policies. All the evidence suggests that the violations were caused by personal differences between Davis and his wife. Davis was not acting in the course of his duties as a deputy sheriff and was not acting in furtherance of departmental goals. In fact, the only significant relationship that existed between defendant and the incident was that Davis and his wife were departmental employees and that Davis' gun was sanctioned by the department. On this record, there is simply not enough evidence to suggest that defendant's failure to train, supervise, or provide specific services to employees was the cause of the violations at hand.

Alternatively, and as an independent basis for reversal, even if we conclude that the action or inaction of defendant with respect to supervision and retention of employees and operation of the

department constituted a policy that was the moving force behind the violations the plaintiffs suffered, we cannot conclude that those policies amounted to "deliberate indifference." Rather, we are persuaded that each of the failings alleged to exist within the department amounted to, at most, mere negligence. See *Pembaur v Cincinnati,* 475 US 469, 483; 106 S Ct 1292; 89 L Ed 2d 452 (1986).

With regard to the screening of applicants and psychological testing, uncontroverted testimony established that some screening was done and that background investigations were conducted on all applicants. With regard to the assertion that defendant lacked psychological and sociological support services, uncontroverted testimony established that general county-wide programs were in existence since Davis' retention as an employee. With regard to the periodic written evaluations, uncontroverted testimony established that attempts to use such a program were resisted by the union. In any case, the testimony established that supervisors conducted on-site evaluations day to day. Finally, with regard to the allegations that there existed a code of silence within the department, the uncontroverted testimony established that it was not the policy of the department to permit such activity. In fact, much of the testimony of the supervisors and the training personnel suggested that every possible effort to break the code of silence was undertaken. Under the circumstances, all of the allegations amount to, at worst, negligence, which is an insufficient degree of culpability for imposition of liability under § 1983. *York, supra* at 757.

Having concluded that the record, when viewed in a light most favorable to plaintiffs, was insufficient as a matter of law to support a claim for damages under § 1983, we now turn to those issues

raised by plaintiffs on cross appeal to determine whether a new trial is warranted.

Initially, plaintiffs named Wayne County as a defendant in this matter, arguing common-law negligence as a theory of recovery. However, as stated above, Wayne County was dismissed on the basis of the doctrine of governmental immunity. On several occasions, plaintiffs moved to add Wayne County as a defendant to the § 1983 action, relying on *Rushing v Wayne Co,* 436 Mich 247, 259-260; 462 NW2d 23 (1990), cert den 111 S Ct 1310 (1991). On appeal, defendant concedes that Wayne County would have been a proper defendant in relation to the § 1983 claim. However, inasmuch as we have concluded that the record was insufficient to support a § 1983 claim, the question whether Wayne County may also be held liable on this theory is moot because there are no specific allegations of policy-related deliberate indifference attributable to the county.

In the midst of the litigation, plaintiffs also sought to add a count against defendant based upon violations of the Michigan Constitution, citing *Smith v Dep't of Public Health,* 428 Mich 540; 410 NW2d 749 (1987), reh den 429 Mich 1207 (1987), aff'd sub nom *Will v Michigan Dep't of State Police,* 491 US 58; 109 S Ct 2304; 105 L Ed 2d 45 (1989). While it is true that our Supreme Court recognized that a cause of action for violation of the Michigan Constitution existed in theory, the Court was unable to articulate what constitutes such a claim.[4] In this case, having concluded that the actions of defendant were not the cause of whatever violations may have occurred,

---

[4] At least four justices of the Court, in a memorandum opinion, agreed that a claim for damages against the state arising from a violation of the Michigan Constitution by the state may be recognized. *Smith, supra* at 544.

the question whether a claim under the state constitution exists independently of this § 1983 claim is also moot.

Plaintiffs next argue that the court erred in refusing to allow former Wayne County Sheriff William Lucas to be treated as an adverse witness under MCL 600.2161; MSA 27A.2161.[5] The purpose of the "adverse witness" statute is to permit the free cross-examination of adverse parties that are called as witnesses by the opposing party. *Shields v Reddo*, 432 Mich 761, 779; 443 NW2d 145 (1989). In this case, Lucas was no longer employed in the Wayne County Sheriff's Department and was not an agent for that entity at the time the alleged violations took place. While it is true that Lucas was a Wayne County executive at the time the incident at issue occurred, Wayne County was dismissed as a party defendant before trial. Accordingly, the adverse witness statute did not apply to Lucas because he was not an agent or employee of a defendant at the time of the occurrence. *Thompson v Essex Wire Co*, 27 Mich App 516, 530; 183 NW2d 818 (1970).

In any event, the decision to allow cross-examination under the "adverse witness" statute is left to the trial court's discretion. *Id.* Even if the statute applied to Lucas, plaintiffs are unable to point to anything that would have been admissible under the statute. Plaintiffs' request to examine Lucas regarding prior cases brought against defendant for violation of inmates' constitutional rights had little or no relevance to the case at hand.[6]

---

[5] This issue, and the one that follows, were not specifically raised in plaintiffs' brief on cross appeal. Rather, the issues were raised in plaintiffs' responsive brief.

[6] Plaintiffs requested that they be permitted to examine Lucas and Ficano regarding *Marchese v Lucas*, 758 F2d 181 (CA 6, 1985), and *Jail Inmates v Wayne Co Executive*, 178 Mich App 634; 444 NW2d 549 (1989). These cases were brought against the department for

Plaintiffs examined Lucas at length regarding his recollection of policies and procedures adopted when he was the sheriff. For the most part, Lucas was unable to recall most of the policy decisions made during his tenure as Wayne County Sheriff. No amount of cross-examination under the "adverse witness" statute would have made Lucas remember those events. Accordingly, the trial court did not abuse its discretion in denying plaintiffs' request to examine Lucas under the statute.

Finally, plaintiffs claim that the trial court erred in excluding the testimony of a suspect who was allegedly mistreated by Davis. A trial court's decision to admit evidence is within its sound discretion and will not be reversed absent an abuse of that discretion. *Price v Long Realty, Inc,* 199 Mich App 461, 466; 502 NW2d 337 (1993). In plaintiffs' offer of proof, the suspect stated that he had been arrested by Davis for reckless driving and was subsequently beaten by other deputies. However, the suspect was unable to positively identify Davis as being responsible for the beating because he was transported to the station by the other deputies. On the basis of the offer of proof, the court concluded that the testimony of the suspect was irrelevant because he could not establish any wrongdoing on the part of Davis that would be attributable to the department. We cannot say that the court abused its discretion in this regard.

Having concluded that the trial court did not err in the manner in which trial was conducted, and having concluded that the record was insufficient as a matter of law to support plaintiffs' claim

violations of inmates' Eighth Amendment rights and were specific to the physical conditions in the jail. Their relevance in regard to the lack of control that defendant exerted over its employees is questionable.

under § 1983, plaintiffs' arguments related to additur and to costs and attorney fees are moot. We recognize the tragic circumstances underlying the claims made by plaintiffs in this case. However, we are not ready to impose monetary liability on municipalities or other government agencies for employee conduct that occurs outside the scope of employment unless that conduct is very clearly motivated by official policies or customs to which the employee is expected to adhere. Accordingly, the verdict in favor of plaintiffs is reversed, and the cause is remanded for entry of judgment in favor of defendant.

Reversed and remanded for further proceedings consistent with this opinion.