# STATE OF MICHIGAN

# COURT OF APPEALS

KEYON HARRISON,

        Plaintiff-Appellant,

and

THE AMERICAN CIVIL LIBERTIES UNION
OF MICHIGAN,

        Amicus Curiae,

v

CURT VANDERKOOI and CITY OF GRAND
RAPIDS,

        Defendants-Appellees.

UNPUBLISHED
May 23, 2017

No. 330537
Kent Circuit Court
LC No. 14-002166-NO

Before: WILDER, P.J., and BOONSTRA and O'BRIEN, JJ.

PER CURIAM.

Plaintiff appeals by right the trial court's order denying his motion for partial summary disposition, granting summary disposition in favor of defendant Captain Curt VanderKooi of the Grand Rapids Police Department (GRPD) under MCR 2.116(C)(7), (C)(10), and (I)(2), and granting summary disposition in favor of defendant City of Grand Rapids (the city) under MCR 2.116(C)(10). Plaintiff also appeals the trial court's order granting defendants' motion to strike plaintiff's expert. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

This case presents many of the same issues as *Johnson v VanderKooi*, ___ Mich App ___; ___ NW2d ___ (2017); in fact, the cases were consolidated in the trial court for purposes of discovery. Like *Johnson*, this case involves the application of GRPD's "photograph and print" (P&P) procedure during a field interrogation of a minor who lacked official identification. In both cases, the minor was not charged with a crime. We describe the procedure at issue in more depth in *Johnson*. *Id*. at ___.

In this case, VanderKooi made contact with plaintiff after observing him walk up to another young man and hand him what appeared to be a large "model type engine to a train." The young man then rode off on his bicycle carrying the object that plaintiff had handed to him.

-1-

VanderKooi testified that he decided to continue his observation because the exchange "looked like some kind of transaction between the two." VanderKooi, who was in an unmarked police car, followed plaintiff and observed him enter a park. VanderKooi testified that plaintiff's behavior in the park seemed "suspicious," because plaintiff went into a secluded area of the park, crouched down and began moving his arms.

VanderKooi put out a radio broadcast for an officer to come to the scene and for another officer to find the individual on the bicycle. VanderKooi parked his vehicle, approached plaintiff in the park, identified himself, and asked plaintiff what he was doing. VanderKooi testified that he believed plaintiff said that he was trying to catch birds. VanderKooi further testified that he asked plaintiff what he had been doing across the street, and plaintiff told him that he was walking home from school and that the object plaintiff had been carrying, which he described as the engine of a train, was for a school project. Plaintiff told VanderKooi that he had given the object to a friend who was going to return it to another person. According to VanderKooi, there had been a number of larcenies and home invasions in that area, especially after school, and he was suspicious that plaintiff's story was not truthful. VanderKooi admitted that, if true, plaintiff's story did not reveal any illegal conduct.

When asked why he did not believe plaintiff, VanderKooi testified as follows:

> Well, because his behavior in the park when I first saw him it just, to me, looked like he could, he was acting rather unusual and I was suspecting might be a lookout and that the property was, a lot of times when you get stolen property they'll secrete it at different locations near where they have taken it, and they take things, object by object they take it and deliver it somewhere else. So, that was what was going through my mind when I saw this transaction, and more so I was confirming what was going on looking suspicious the way he was in the park in the woods, wooded area and he was actually kneeling or crouching.

VanderKooi testified that plaintiff was carrying a knapsack, and that he asked for consent to look inside the knapsack. Plaintiff gave consent, so VanderKooi asked him to open up the knapsack. Plaintiff opened it up, and VanderKooi looked inside, where he observed school materials. Plaintiff was not carrying official identification.

At some point after VanderKooi made contact with plaintiff, Officer Luke Nagtzaam and Sergeant Stephen Labrecque of the GRPD arrived at the scene. VanderKooi testified that he asked one of the officers to take a picture of plaintiff and that he did not ask for plaintiff's fingerprints to be taken. However, VanderKooi testified that he later learned, after this lawsuit was initiated, that a print was also taken.

Nagtzaam testified that plaintiff consented to a search of his person, and that Labrecque at some point obtained a P&P from plaintiff. Nagtzaam described the contact between plaintiff and Captain VanderKooi as "low key and non-confrontational." Labrecque testified that he remembered hearing a request for a P&P over the dispatch system, but that he could not remember who had made the request. Labrecque took plaintiff's picture with a digital camera and obtained plaintiff's thumbprint using a GRPD-issued thumbprint card and inkpad.

Labrecque testified that the P&P was quick and would not have taken more than two minutes. Labrecque was not involved with the investigation beyond performing and logging the P&P.

At some point during these events, GRPD Officer Dennis Newton made contact with the individual on the bicycle, who consented to a search, provided identification, and was eventually released. Newton testified that someone from plaintiff's scene reported over the radio that the two boys' stories about the object had matched. Newton informed someone at plaintiff's scene that the individual on the bicycle no longer possessed the object that VanderKooi had seen. VanderKooi testified that, once he learned that the other individual did not have the object, he let plaintiff walk away because the situation did not rise to the level of probable cause.

According to VanderKooi, plaintiff was free to leave during the encounter and could have left without having his picture taken. VanderKooi testified that he recalled asking plaintiff if it was "okay if we take a picture, and he said yes." He testified that no officer would have taken plaintiff's picture if he had said "no." VanderKooi further testified that he did not run plaintiff's thumbprint through the Automated Fingerprint Identification System (AFIS) and had no personal knowledge of any other officer doing so.

Plaintiff testified that he consented to the search of his person and bag. He testified that VanderKooi told him that he needed to take his picture to identify who he was. Plaintiff further testified that he said "okay" in a nervous and shaky voice. Plaintiff described the officers' demeanors during the stop as calm. Plaintiff also testified that he asked why his fingerprint needed to be taken, and that VanderKooi told him it was "just to clarify again to make sure you are who you say you are." Plaintiff testified that he responded "okay." Plaintiff's thumbprint was then taken. Plaintiff testified that VanderKooi told him that he was "good to go" and that plaintiff shook the officers' hands before going home. He testified that he was "freaked out" by the incident and that his mother drove him to and from school for the next two weeks because he was too scared to walk to school after the incident. Plaintiff was 16 years old at the time of the incident.

In March 2014, plaintiff filed suit,[1] alleging claims against VanderKooi under 42 USC § 1981, 42 USC § 1983, and 42 USC § 1988. The complaint alleged that, without probable cause or lawful consent, VanderKooi had directed an officer to search, photograph, and thumbprint plaintiff. The complaint further alleged that VanderKooi had taken these actions because plaintiff was African American; that there was no legal justification for the stop, detention, search, photograph, or thumbprint; and that VanderKooi's actions—individually or by direction to other officers—were unreasonable. The complaint alleged that VanderKooi violated plaintiff's right to equal protection and to equal rights under 42 USC § 1981, as well as plaintiff's Fourth Amendment rights and his constitutional right to privacy. The complaint requested damages, the destruction of the photograph and thumbprint, fees and costs, and any other relief deemed appropriate. Plaintiff later amended his complaint to allege that the P&P

---

[1] The suit was originally brought by plaintiff's next friend, Anchanet Harrison (his mother), but was eventually amended to name plaintiff, individually, as the named plaintiff.

constituted a taking in violation of his Fifth Amendment rights and to add a claim for municipal liability under 42 USC § 1983.

By stipulated order, plaintiff's case was consolidated with *Johnson* for purposes of discovery only. In 2015, plaintiff moved for partial summary disposition on his Fourth and Fifth Amendment claims, and on his equal protection claim against VanderKooi and his municipal liability claim against the city insofar as they related to the P&P procedure.

Both defendants moved for summary disposition. VanderKooi argued that plaintiff's constitutional rights were not violated and that he was protected by qualified immunity regarding plaintiff's Fourth and Fifth Amendment claims because the law regarding photographing and fingerprinting during an investigatory stop was not clearly established. VanderKooi further argued that he had reasonable suspicion to stop plaintiff, or in the alternative that the contact was a consensual encounter. VanderKooi argued that there was no constitutional right to privacy applicable to this situation, that plaintiff could not show purposeful racial discrimination, and that no taking had occurred. The city argued that plaintiff could not establish a violation of his constitutional rights or that the city was the moving force behind any violation.

Defendants later moved to strike plaintiff's proposed expert witness, Dr. William Terrill, a professor of criminal justice at Michigan State University.

Following a motion hearing (which was combined with the motion hearing in *Johnson*), trial court issued two separate written opinions and orders regarding the motion to strike Dr. Terrill and the motions for summary disposition. With respect to the motion to strike, the trial court held that the proposed testimony was inadmissible under MRE 702 and MRE 403. With regard to VanderKooi's motion for summary disposition, the trial court held that the length of the stop was reasonable and not excessive and that plaintiff had failed to establish a genuine issue of material fact. The trial court further held that plaintiff had consented to the P&P. The trial court determined that no Fifth Amendment taking had occurred and that no constitutional right to privacy apart from that provided by the Fourth Amendment was implicated. The trial court also held that VanderKooi was protected by qualified immunity regarding plaintiff's Fourth and Fifth Amendment claims as related to the P&P procedure. With respect to the § 1981 and equal protection claims, the trial court held that plaintiff had failed to provide evidence of a discriminatory purpose. Accordingly, the trial court granted summary disposition in favor of VanderKooi under MCR 2.116(C)(10), (C)(7), and (I)(2). Finally, the trial court addressed the city's motion for summary disposition and held that plaintiff had failed to establish a violation of his constitutional rights; consequently, summary disposition in favor of the city was proper under MCR 2.116(C)(10).

This appeal followed.

## II. CAPTAIN VANDERKOOI

Plaintiff argues that the trial court erred by failing to grant partial summary disposition in his favor on his claims against VanderKooi relative to the ordering of the P&P, and erred by granting summary disposition in favor of VanderKooi on all of the claims against him. We disagree.

-4-

## A. STANDARD OF REVIEW

We review de novo a trial court's grant of summary disposition. See *Innovation Ventures v Liquid Mfg*, 499 Mich 491, 506; 885 NW2d 861 (2016); see also *Fisher Sand & Gravel Co v Neal A Sweebe, Inc*, 494 Mich 543, 553; 837 NW2d 244 (2013). The trial court denied plaintiff's motion for partial summary disposition under MCR 2.116(C)(10) and granted summary disposition to Captain VanderKooi under MCR 2.116 (C)(7), (C)(10), and (I)(2); therefore, the following standards apply: "A motion for summary disposition under MCR 2.116(C)(7) asserts that a claim is barred by immunity granted by law" and "may be supported or opposed by affidavits, depositions, admissions, or other documentary evidence; the substance or content of the supporting proofs must be admissible in evidence." *By Lo Oil Co v Dep't of Treasury*, 267 Mich App 19, 26; 703 NW2d 822 (2005) (explaining that the complaint's allegations "are accepted as true unless contradicted by documentary submissions"). "A trial court properly grants a motion for summary disposition under MCR 2.116(C)(7) when the undisputed facts establish that the moving party is entitled to immunity granted by law."

> A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. When evaluating a motion for summary disposition under MCR 2.116(C)(10), a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties . . . in the light most favorable to the party opposing the motion. Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. [*Id*. at 507 (quotation marks and citation omitted; alteration in original.]

"A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

"Whether an asserted federal right was clearly established at a particular time, so that a public official who allegedly violated the right has no qualified immunity from suit, presents a question of law," which is reviewed de novo on appeal. *Elder v Holloway*, 510 US 510, 516; 114 S Ct 1019, 1023; 127 L Ed 2d 344 (1994). See also *Morden v Grand Traverse Co*, 275 Mich App 325, 340; 738 NW2d 278 (2007). Finally, the application of constitutional provisions is a question of law that this Court reviews de novo. *Hardrick v Auto Club Ins Ass'n*, 294 Mich App 651, 685; 819 NW2d 28 (2011), lv den 493 Mich 867 (2012).

## B. FOURTH AND FIFTH AMENDMENT CLAIMS RELATED TO THE P&P

With respect to the Fourth and Fifth Amendment claims arising from the P&P procedure, and for the reasons set forth in *Johnson*, ___ Mich App at ___, we hold that VanderKooi was protected by qualified immunity. Consequently, the trial court did not err by denying summary disposition to plaintiff or by granting summary disposition in favor of VanderKooi under MCR 2.116(C)(7).

## C. REMAINING FOURTH AMENDMENT CLAIMS

The trial court also did not err by holding that VanderKooi had not violated plaintiff's Fourth Amendment rights by making contact with plaintiff or performing a search of his bag.

A person is liable under 42 USC 1983 if he or she, "under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . ." 42 USC 1983. "Section 1983 itself is not the source of substantive rights; it merely provides a remedy for the violation of rights guaranteed by the federal constitution or federal statutes." *York v Detroit (After Remand)*, 438 Mich 744, 757-758; 475 NW2d 346 (1991). "A cause of action under § 1983 is stated where a plaintiff shows (1) that the plaintiff was deprived of a federal right, and (2) that the defendant deprived the plaintiff of that right while acting under color of state law." *Davis v Wayne Co Sheriff*, 201 Mich App 572, 576-577; 507 NW2d 751 (1993).

"The Fourth Amendment, binding on the States by the Fourteenth Amendment, provides that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.' " *Maryland v King*, ___ US ___, ___; 133 S Ct 1958, 1968; 186 L Ed 2d 1 (2013), quoting US Const, Am IV. "A 'seizure' within the meaning of the Fourth Amendment occurs only if, in view of all the circumstances, a reasonable person would have believed that he was not free to leave." *People v Jenkins*, 472 Mich 26, 32; 691 NW2d 759 (2005). However, "[p]olice officers may make a valid investigatory stop if they possess 'reasonable suspicion' that crime is afoot" without a warrant. *People v Champion*, 452 Mich 92, 98; 549 NW2d 849 (1996), citing *Terry v Ohio*, 392 US 1, 20; 88 S Ct 1868, 1879; 20 L Ed 2d 889 (1968). Additionally, a search conducted pursuant to consent is an exception to the warrant requirement. *People v Borchard-Ruhland*, 460 Mich 278, 294; 597 NW2d 1 (1999). The consent exception to the warrant requirement allows a search and seizure when consent is unequivocal, specific, and freely and intelligently given." *Lavigne v Forshee*, 307 Mich App 530, 538; 861 NW2d 635 (2014) (quotation marks and citation omitted). Consent can "be given in the form of words, gesture, or conduct," but "cannot be established by showing no more than acquiescence to a claim of lawful authority." *Id*. at 540 (quotation marks and citation omitted). The voluntariness of consent is determined by analyzing the totality of the circumstances, and consent may be voluntary even if the defendant does not know that he has a right to refuse consent; "knowledge of the right to refuse consent is one factor to be taken into account, [but] the government need not establish such knowledge as the *sine qua non* of an effective consent." *Ohio v Robinette*, 519 US 33, 39; 117 S Ct 417, 421; 136 L Ed 2d 347 (1996) (quotation marks and citation omitted). See also *Borchard-Ruhland*, 460 Mich at 294 (explaining "that the people need not prove that the person giving consent knew of the right to withhold consent").

In this case, the initial contact between plaintiff and VanderKooi was consensual. Plaintiff testified that VanderKooi identified himself and asked to speak with him, and plaintiff said "sure." With respect to the search of his bag, the record also reflects that VanderKooi asked plaintiff for permission to look in the bag, and that plaintiff said "yes." Plaintiff's consent was thus unequivocal, specific, and freely given. *Forshee*, 307 Mich App 530, 538.

Plaintiff argues, however, that the length of his detention was unreasonable. The trial court found both that plaintiff consented to the initial contact and never attempted to leave during the encounter and that, if the contact was a stop, it was based on a reasonable suspicion on VanderKooi's part and was not of excessive duration. Indeed, plaintiff testified that, following the stop, and after VanderKooi heard his explanation, VanderKooi told him to "hold on" and then called for additional officers. Plaintiff, a minor, was told to wait by an adult police officer who summoned more officers to assist him. At the least, therefore, there was a genuine issue of material fact regarding whether plaintiff was seized at that point. *Jenkins*, 472 Mich at 32 (explaining that "[a] 'seizure' within the meaning of the Fourth Amendment occurs only if, in view of all the circumstances, a reasonable person would have believed that he was not free to leave").

However, we agree that the stop was based on a reasonable suspicion and that the detention was not of an excessive duration. As our Supreme Court has explained, law enforcement officers are able to "approach and temporarily detain a person for the purpose of investigating possible criminal behavior even though there is no probable cause to support an arrest," and the "brief detention does not violate the Fourth Amendment if the officer has a reasonably articulable suspicion that criminal activity is afoot." *Id*. at 32. Reasonable suspicion is analyzed on a case-by-case basis and takes into account the totality of the circumstances. *Id*. "A determination regarding whether a reasonable suspicion exists must be based on commonsense judgments and inferences about human behavior." *Id*. (quotation marks and citation omitted). Officers are able "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v Arvizu*, 534 US 266, 273; 122 S Ct 744, 750-751; 151 L Ed 2d 740 (2002). Ultimately, officers must have more than a mere hunch, but reasonable suspicion is a lower standard than probable cause and is much lower than a preponderance of the evidence. See *id*. at 274 ("Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard") (quotation marks and citation omitted). With regard to the length of the detention, a court must examine "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v Sharpe*, 470 US 675, 686; 105 S Ct 1568, 1575; 84 L Ed 2d 605 (1985).

VanderKooi testified that he observed behavior between plaintiff and another individual that at least raised the question of whether a transfer of stolen property had occurred. VanderKooi explained that stolen property was often taken piece by piece and then delivered somewhere else, and he indicated that the transaction he had observed was consistent with moving stolen property, which led to the following thought going through his mind: "You got a person that's walking and now he gets it to the person on the bike, and the guy on the bike can get away quicker and bring it to somewhere else." VanderKooi further explained that, when he observed plaintiff kneeling or crouching in a patch of small trees and grass, he suspected that plaintiff was acting as a lookout. In addition, VanderKooi testified that he had worked for GRPD since 1980 and that he was very familiar with Grand Rapids and its crime patterns. VanderKooi asserted that there were a lot of larcenies and home invasions in the area of the

incident, especially after school, and that home invasions and larcenies were higher the closer one got to the core of the city. VanderKooi explained that most home invasions occurred during the daytime when people were not home and that, during his 36 years as a police officer in the city, he recognized the area where the incident occurred as one where there were more home invasions than other areas.

Although these facts do not rise to the level of probable cause, and individually may be insufficient to support a reasonable suspicion, when the totality of the circumstances is examined, we conclude that the trial court did not err by holding that VanderKooi possessed a reasonable suspicion sufficient to instigate a brief investigatory stop. See *Arvizu*, 534 US at 274 (explaining the holding in *Terry* in the following manner: "Although each of the series of acts was perhaps innocent in itself, we held that, taken together, they warranted further investigation.") (quotation marks and citation omitted); *Jenkins*, 472 Mich at 32. Plaintiff's reliance on *People v Shabaz*, 424 Mich 42; 378 NW2d 451 (1985) is misplaced. *Shabaz* involved a defendant who was merely carrying a bag with indeterminate contents and who fled when he saw a police car. Our Supreme Court stated that flight "might reasonably have heightened the officer's general suspicion . . . . But heightened general suspicion occasioned by the flight of a surveillance subject does not alone supply the particularized, reasoned, articulable basis to conclude that criminal activity was afoot that is required to justify the temporary seizure approved in *Terry*." *Id*. at 62-63.

In this case, by contrast, VanderKooi was able to articulate a particular and reasoned basis for his decision to conduct an investigatory stop: to determine whether plaintiff was involved in the transportation of items stolen during a home invasion or was acting as a lookout. The fact that the circumstances of the incident did not rise to the level of probable cause (a fact that VanderKooi acknowledged) or that VanderKooi's suspicion was ultimately proven to be false, does not negate the reasonableness of his suspicion. *Illinois v Wardlow*, 528 US 119, 126; 120 S Ct 673, 677; 145 L Ed 2d 570 (2000) (explaining that, in allowing investigatory detentions, "*Terry* accepts the risk that officers may stop innocent people").

With regard to the length of the detention, plaintiff argues that the trial court erred by concluding that the entire encounter lasted approximately 10 to 15 minutes, and argues that the police report demonstrates that the encounter lasted 55 minutes. However, the police report does not indicate that the encounter lasted 55 minutes. The police report has two boxes: one for the time of the incident and one for the *report* date and time. The time for the incident is listed as 15:08. The report time is 16:03. The time of the report is not indicative of when the encounter concluded and does not contradict the evidence, in the form of VanderKooi's answer to plaintiff's interrogatories, that it lasted 10 to 15 minutes.

Further, regardless of the precise length of time, the evidence shows that GRPD officers "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe*, 470 US at 686. VanderKooi sought to ascertain plaintiff's identity and the origin of the object that he believed may have been stolen. Officers contacted the other individual involved, and the two stories were compared, after which VanderKooi recognized that he lacked probable cause for an arrest and plaintiff was released. The trial court did not err by granting summary disposition in favor of VanderKooi on the ground that no Fourth Amendment violations occurred.

### D. EQUAL PROTECTION AND 42 USC § 1981 CLAIMS

Plaintiff also argues that the trial court erred by failing to determine that the P&P procedure violated his Fourteenth Amendment right to equal protection or the requirement under § 1981 that he be afforded equal rights. We disagree.

42 USC § 1981 provides as follows:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

The language of § 1981 "establishes four protected interests: (1) the right to make and enforce contracts; (2) the right to sue, be parties, and give evidence; (3) the right to the full and equal benefit of the laws; and (4) the right to be subjected to like pains and punishments." *Phelps v Wichita Eagle-Beacon*, 886 F2d 1262, 1267 (CA 10, 1989). A plaintiff must establish three requirements for a § 1981 claim: "(1) he or she is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute . . . ." *Bellows v Amoco Oil Co*, 118 F3d 268, 274 (CA 5, 1997).

The United States Supreme Court has stated that "purposeful discrimination that violates the Equal Protection Clause of the Fourteenth Amendment will also violate § 1981." *Gratz v Bollinger*, 539 US 244, 276 n 23; 123 S Ct 2411, 2431; 156 L Ed 2d 257 (2003). See also *Grutter v Bollinger*, 539 US 306, 343; 123 S Ct 2325, 2347; 156 L Ed 2d 304 (2003), superseded on other grounds by Const 1963, art 1, § 26 as stated in *Harrington v Scribner*, 785 F3d 1299, 1308 (CA 9, 2015) (explaining that "the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause"). As plaintiff's claim under the Fourteenth Amendment is premised on purposeful discrimination, his claims under § 1981 and § 1983 claims are overlapping.

The Equal Protection Clause of the Fourteenth Amendment is essentially a direction that all persons similarly situated should be treated alike," *Lawrence v Texas*, 539 US 558, 579; 123 S Ct 2472, 2484; 156 L Ed 2d 508 (2003), and it provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws," US Const, Am XIV. "Racially selective law enforcement violates this nation's constitutional values at the most fundamental level; indeed, unequal application of criminal law to white and black persons was one of the central evils addressed by the framers of the Fourteenth Amendment." *Marshall v Columbia Lea Regional Hosp*, 345 F3d 1157, 1167 (CA 10, 2003). Even consensual searches and seizures "may violate the Equal Protection Clause when they are initiated solely based on racial considerations." *United States v Travis*, 62 F3d 170, 173 (CA 6, 1995), cert den 516 US 1060 (1996).

> The requirements for a claim of racially selective law enforcement draw on what the Supreme Court has called "ordinary equal protection standards." *Armstrong*, 517 U.S. at 465 (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). The plaintiff must demonstrate that the defendant's actions had a discriminatory effect and were motivated by a discriminatory purpose, *Armstrong*, 517 U.S. at 465. These standards have been applied to traffic stops challenged on equal protection grounds. *Chavez v. Illinois State Police*, 251 F.3d 612, 635-36 (7th Cir. 2001); *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533-36 (6th Cir. 2002). [*Marshall*, 345 F3d at 1168. See also *Carrasca v Pomeroy*, 313 F3d 828, 834 (CA 3, 2002) ("To prevail on an equal protection claim in the racial profiling context, Plaintiffs would have to show that the challenged law enforcement practice had a discriminatory effect and was motivated by a discriminatory purpose.").]

Thus, in order to survive a motion for summary disposition, "a plaintiff in a § 1983 suit challenging alleged racial discrimination in traffic stops and arrests must present evidence from which a jury could reasonably infer that the law enforcement officials involved were motivated by a discriminatory purpose and their actions had a discriminatory effect." *Marshall*, 345 F3d at 1168. Discriminatory effect requires a showing that similarly situated individuals of a different race were treated differently. *United States v Armstrong*, 517 US 456, 465; 116 S Ct 1480, 1487; 134 L Ed 2d 687 (1996). A plaintiff may use statistical evidence or identify specific individuals of another race to demonstrate such an effect. *Bennett v Eastpointe*, 410 F3d 810, 818 (CA 6, 2005).

In this case, plaintiff argued that statistical evidence, as well as the fact that VanderKooi had chosen to pursue him instead of the other individual, established a discriminatory effect. Additionally, plaintiff argues that the other person was not subject to the P&P procedure although he did not have identification. The other person did provide an affidavit stating that he was not searched or P&P'd even though he lacked identification. However, both he and plaintiff were subjected to a stop by GRPD officers for the same reason, and Newton testified that the individual on the bicycle provided a school identification card, that he believed the identity was accurate, and that he performed a search to which the individual consented.

With regard to statistical evidence, plaintiff provides an analysis of 439 GRPD incident reports in 2011 and 2012 and concludes that 75% of the officer-initiated encounters described

involved a black subject while only 15% involved white subjects, despite the 2010 Grand Rapids census showing that the city's population as 21% black and 65% white.

With regard to the statistical evidence, federal courts have noted limitations in the use of general census data as a benchmark for proof of discriminatory effect in police encounters. See *Chavez*, 251 F3d at 643-645 (noting that "[i]t is widely acknowledged that the Census fails to count everyone, and that the undercount is greatest in certain subgroups of the population, particularly Hispanics and African–Americans"; explaining that, even assuming the census data was accurate, it did not shed light on the number of minorities driving on the Illinois highways; and concluding that it could "not find that the statistics prove that the Valkyrie officers' actions had a discriminatory effect on the plaintiffs"). However, even assuming that the statistical evidence or the affidavit of the other involved individual sufficed to create a genuine issue of material fact regarding discriminatory effect, plaintiff has failed to demonstrate a discriminatory purpose.

Under the discriminatory purpose requirement, courts "may consider direct evidence of discrimination, statistical evidence showing a discriminatory impact, or other factors that could reveal a discriminatory purpose, like the historical background of the policy." *Mendiola– Martinez v Arpaio*, 836 F3d 1239, 1261 (CA 9, 2016); see also *McCleskey v Kemp*, 481 US 279, 293, 293 n 12; 107 S Ct 1756, 1767; 95 L Ed 2d 262 (1987). The discriminatory purpose need not be the only purpose, but it must be a motivating factor in the decision." *Marshall*, 345 F3d at 1168.

Although plaintiff asserts that the trial court erred by not analyzing his claims under the burden-shifting framework articulated in *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973), we conclude the application of that framework would not have altered the outcome. VanderKooi alleged a nondiscriminatory reason for the stop, search, and P&P. Thus, regardless of whether this Court frames the analysis as one under *McDonnell Douglas*, the issue remains the same: construing the evidence submitted by the parties in a light most favorable to plaintiff, did he present sufficient evidence for a reasonable jury to infer that VanderKooi had acted with a discriminatory purpose? We conclude that he did not. None of the evidence presented reveals a racial motivation in VanderKooi's decision-making, and the statistics offered by plaintiff, even assuming that they showed a discriminatory effect in the number of officer-initiated stops in the city of Grand Rapids, are insufficient to demonstrate that VanderKooi acted with a discriminatory purpose in *his* case. See *McCleskey*, 481 US at 292.

Plaintiff therefore failed to present evidence from which a jury could reasonably infer that VanderKooi or other officers on the scene acted with a discriminatory purpose. See *Innovation Ventures*, 499 Mich at 507. Accordingly, the trial court properly granted summary disposition in favor of VanderKooi on plaintiff's § 1981 and equal protection claims.

### III. CLAIMS AGAINST THE CITY

Plaintiff argues that the trial court erred by granting summary disposition in favor of the city under MCR 2.116(C)(10). We disagree for the reasons stated in *Johnson*, ___ Mich App at ___, and affirm the trial court's grant of summary disposition in favor of the city.

## IV. DEFENDANTS' MOTION TO STRIKE

Finally, plaintiff argues that the trial court erred by granting defendants' motion to strike his proposed expert witness's testimony. We disagree, largely for the reasons stated in *Johnson*, ___ Mich App at ___. We further disagree, with regard to plaintiff's § 1981 and equal protection claims, for the following additional reasons.

MRE 702 governs expert testimony and provides as follows:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

MRE 702 "requires the circuit court to ensure that each aspect of an expert witness's testimony, including the underlying data and methodology, is reliable," and it "incorporates the standards of reliability that the United States Supreme Court articulated in *Daubert v Merrell Dow Pharm, Inc*," 509 US 579, 113 S Ct 2786, 125 L Ed 2d 469 (1993). *Elher v Misra*, 499 Mich 11, 22; 878 NW2d 790 (2016). *Daubert* requires that the trial court ensure all scientific testimony is relevant and reliable. *Id*. at 22-23. Although not dispositive, absence of supporting literature "is an important factor in determining the admissibility of expert witness testimony." *Id*. at 23.

In this case, the trial court noted that plaintiff wished to use Dr. Terrill's testimony to "draw conclusions from the evidence of a racial disparity in P&P reports . . . based on an analysis of incident reports, and the use of ordinary mathematical computations that any lay person can perform . . . ." The trial court reasoned that the trier of fact did not need assistance to understand the facts and evidence and that the process by which Dr. Terrill arrived at his conclusions was unclear. Further, the trial court concluded that plaintiff failed to meet the *Daubert* standard because he did not cite any peer-reviewed literature supporting Dr. Terrill's method of using unadjusted census data. The trial court thus determined, and we agree, that Dr. Terrill's testimony was inadmissible under MRE 702. Plaintiff failed to establish that Dr. Terrill's statistical analysis and resulting opinion was based on sufficient data or reliable methods. When asked whether he was aware of any expert that uses unadjusted census data, Dr. Terrill replied, "I haven't got that far in my analysis or research of adjusted, non-adjusted. It's something that I am going to ponder into very carefully and very thoughtfully." We conclude that the trial court did not abuse its discretion in striking Dr. Terrill's testimony pursuant to MRE 702. See *Elher*, 499 Mich at 28 (holding that the trial court did not abuse its discretion and explaining that, although "peer-reviewed, published literature is not always necessary or sufficient to meet the requirements of MRE 702, the lack of supporting literature, combined with the lack of any other form of support, rendered [the expert's] opinion unreliable and inadmissible under MRE 702").

Affirmed.

/s/ Mark T. Boonstra
/s/ Colleen A. O'Brien

Wilder, P.J., did not participate.